UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
02 JUL 10 PM 1:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

STEVEN D. WATTS, SR.,        )
                             )
    Plaintiff,               )
                             )
vs.                          )   Civil Action No. CV-02-S-1126-NE
                             )
UNUM PROVIDENT CORPORATION,  )
et al.,                      )   ENTERED
                             )
    Defendants.              )   JUL 10 2002

## MEMORANDUM OPINION

This action presently is before the court on plaintiff's motion to remand (doc. no. 5). This action was removed by the defendants from the Circuit Court of Madison County on May 3, 2002 pursuant to 28 U.S.C. §§ 1441 and 1331 on the grounds that the "Provident Life and Accident Insurance Company disability insurance coverage in this case is part of an employee welfare benefit plan within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(1)."[1] Plaintiff argues that the disability insurance coverage at issue in this case is *not* part of an employee welfare benefit plan as that term is defined under ERISA because it falls within the "safe harbor" provisions as set out by the Department of Labor appearing at 29 C.F.R. § 2510.3-1(j); and, therefore, the case should be remanded for lack of subject matter jurisdiction.

## I. STATEMENT OF FACTS

Plaintiff, a sales representative employed by Bentley Pontiac-Cadillac, Inc. ("Bentley"), secured long-term disability insurance from Provident Life and Accident Insurance Company ("Provident") under a group plan issued to Bentley on March 1, 1999.[2] The group plan allows

---
[1] Notice of Removal (doc. no. 1), ¶ 4.
[2] *Id.*, exhibit A-2.



eligible employees to obtain disability insurance coverage without the necessity of submitting to a pre-insurance medical examination, provided the employee applies for coverage within the first thirty-one days of eligibility.[3]  An "eligible employee" includes all active, full-time employees.[4] Plaintiff began working as an active, full-time Bentley employee on January 18, 1999[5]. He learned of the long-term insurance plan, at least in part, through the following brochure and enrollment form provided by Bentley:

> **Your most important asset is your ability to earn a living.**
> Think about it... How would you pay your bills if you suddenly became unable to work due to a disabling accident or an extended illness?
>
> Bentley Pontiac is pleased to offer you a solution...
>
> **VOLUNTARY LONG TERM DISABILITY INSURANCE**
>
> | | |
> |---|---|
> | **Eligibility:** | All Active Full Time Employees |
> | **Benefit Amount:** | 60% of Basic Monthly Earnings |
> | **Benefit Maximum:** | $5,000 Per Month |
> | **How does this benefit work?** | If your doctor verifies that you are unable to work due to an accident, illness or pregnancy, this insurance will replace 60% of your usual paycheck until you can return to work or up to age 65. |
> | **When do benefits begin?** | After you have been totally disabled for 3 months. |
> | **How much does this insurance cost?** | To calculate your montly costs use the chart below to determine your monthly premiums. |
>
> **BENEFIT COSTS**
>
> Rate per $100 of                    Monthly LTD Premium Calculation:

---

[3]*Id.*, exhibit A.
[4]*Id.*, exhibit A-1.
[5]*Id.*, exhibit A-3.

2

| Monthly earnings | Employee Age |
|---|---|
| 0.16 | 0-29 |
| 0.24 | 30-34 |
| 0.35 | 35-39 |
| 0.53 | 40-44 |
| 1.07 | 45-49 |
| 1.20 | 50-54 |
| 1.26 | 55-59 |
| 1.60 | 60-64 |
| 1.33 | 65-69 |

(1) _____Annual Salary

(2) _____ ÷ 12 =Monthy Earnings

(3) _____ ÷ 100

(4)x _____Enter Rate from age chart

= $_____(3)x(4)=Payroll Deduction

**\*\*TO ENROLL, COMPLETE AND SIGN THE ATTACHED ENROLLMENT FORM\*\***[6]

The attached "enrollment form" read as follows:

Bentley Pontiac            Policy Number\_\_\_\_\_
Group Insurance Enrollment/Refusal Request Form

...

### BENEFIT INFORMATION

At your own cost, you may elect to insure your paycheck through Provident's Group Voluntary Long Term Disability Insurance. Premiums will be conveniently deducted from payroll. It is important that you enroll within 30 days of becoming eligible, other wise you will have to prove to the insurance company at your own expense that you are in good health.

### BENEFIT ELECTION

|  | Request | Refuse |
|---|---|---|
| Long Term Disability . . . . . . . . . . | ☐ | ☐ |

### SIGNATURE OF EMPLOYEE

To the best of my knowledge all information shown above including the refusal section is correct and my signing below indicates that I understand all information given is subject to verification. I understand that coverage under the group policy will not go into effect unless I am actively at work on or after the proposed effective date, and that my dependents coverage will not go into effect unless they are able to engage in the normal activities of a person of like age on or after their proposed effective date of coverage. Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

---

[6]Notice of Removal (doc. no. 1), exhibit A-1.

> I authorize deductions from my wages to cover my contributions, if required, toward the cost of my insurance.
>
> EMPLOYEE SIGNATURE _____ DATE _____ [7]

Plaintiff elected to enroll in the group, long-term disability insurance plan, and executed an enrollment form on January 20, 1999.[8] Once enrolled in the insurance plan, he was responsible for paying the monthly premiums, which were calculated to be $137 each month.[9] Bentley deducted the premiums directly from plaintiff's paycheck.

Bentley's chief financial officer, Terry Sanderson, attests that Bentley's role in the administration, selection, and selling of Provident long-term disability insurance was limited to allowing Provident's representative, Clark Smith, and Provident to solicit business from Bentley employees, and to drafting the monthly premiums from the paychecks of enrolled employees.[10] He further avers that Bentley did not have a written handbook or policy endorsing or recommending the insurance plan.[11] Patsy Marshall, the chief underwriter of UNUM Provident Corporation attests that under the insurance plan, the employer must sponsor the plan. She also avers that:

> the actual plan offered to employees is agreed upon with the management of the employer, with the employer deciding both the elimination period and the benefit period for each classification of employee before the enrollment begins. In this way, the employee's decision is limited to the decision of whether he or she wants coverage under the group policy.[12]

## II. DISCUSSION

ERISA superpreemption exists only when the "plaintiff is seeking relief that is

---

[7] *Id.*, exhibit A-3.

[8] *Id.*, exhibit A-3.

[9] *Id.*, exhibit B (complaint), ¶ 1.

[10] Motion to Remand (doc. no. 5), exhibit 1, ¶ 13.

[11] *Id.*, ¶ 12.

[12] Notice of Removal (doc. no. 1), exhibit A, ¶ 7

4

> available under 29 U.S.C. § 1132(a)." *Whitt* [*v. Sherman Int'l Corp.*], 147 F.3d [1325] at 1330 (11th Cir. 1998). Regardless of the merits of the plaintiff's actual claims (recast as ERISA claims), relief is available, and there is complete preemption, when four elements are satisfied. First, there must be a relevant ERISA plan. *See id.*; *Kemp v. International Business Machs. Corp.*, 109 F.3d 708, 713 (11th Cir. 1997). Second, the plaintiff must have standing to sue under that plan. *See Engelhardt v. Paul Revere Life Ins. Co.*, 139 F.3d 1346, 1350 n.3 (11th Cir. 1998). Third, the defendant must be an ERISA entity. *See id.*; *Franklin v. QHG of Gadsden, Inc.*, 127 F.3d 1024, 1029 (11th Cir. 1997); *see also Morstein v. National Ins. Servs., Inc.*, 93 F.3d 715, 722 (11th Cir. 1996) (*en banc*) (no preemption at all — not even defensive preemption — when the defendant is a "non-ERISA entity" and the claims do not "affect relations among principal ERISA entities as such"). Finally, the complaint must seek compensatory relief akin to that available under § 1132(a); often this will be a claim for benefits due under a plan. *See Englehart*, 139 F.3d at 1354; *Franklin*, 127 F.3d 1029.

*Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1212 (11th Cir. 1999). There is no question in this case that plaintiff as a beneficiary has standing to sue under the relevant plan, that defendants as the group plan policyholder are ERISA entities, and that plaintiff is seeking compensatory relief "akin" to relief available under § 1132(a) as long as the relevant plan qualifies as an ERISA plan. Thus, the only question presented as to this court's subject matter jurisdiction is whether the relevant plan qualifies as an ERISA plan.

> Th[e] statutory definition of an ERISA employee welfare benefit plan has been fleshed out through a combination of agency regulations and case law. The Department of Labor, which under 29 U.S.C. § 1135 is empowered to promulgate rules interpreting ERISA, has issued "safe harbor" regulations. These regulations provide that group insurance offered to workers through their place of employment will *not* be deemed an ERISA plan if the insurance program satisfies certain enumerated criteria. *See* 29 C.F.R. § 2510.3-1(j)(1) (1992).

The "safe harbor" regulations provide as follows:

> *Certain group or group-type insurance programs.*
> For purposes of Title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which

5

> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
>
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

*Randol v. Mid-West National Life Ins., Co.*, 987 F.2d 1547, 1549 & 1550 n.2 (11th Cir. 1993); *see also* 29 C.F.R. § 2510.3-1(j).

Plaintiff argues that this case should be remanded because the insurance plan at issue falls within the "safe harbor" regulations. Defendants argue that the insurance policy at issue in this case cannot satisfy all four requirements under the "safe harbor" provision. In particular, Defendant's assert that "the undisputed facts establish that Bentley Pontiac-Cadillac, Inc. did endorse the policy," which violates the third element under the "safe harbor" provision.[13]

The third element of the "safe harbor" regulation "explicitly obliges the employer who seeks its safe harbor to refrain from any functions other than permitting the insurer to publicize the program and collecting premiums." *Butero*, 174 F.3d at 1213. In *Butero*, the employer "picked the insurer; it decided on key terms, such as portability and the amount of coverage; it deemed certain employees ineligible to participate; it incorporated the policy terms into the self-described summary plan description for its cafeteria plan; and it retained the power to alter compensation reduction for tax purposes." *Id.* at 1213-14.

---

[13]Defendant's Brief in Opposition to Remand (doc. no. 8), at 9.

In addition to publicizing the insurance plan and collecting premiums in the instant case, Bentley negotiated the terms of the policy (such as the elimination period and the benefit period), completed an application form for the policy, solicited enrollments from its employees, collected money through payroll deductions, and offered the policy on a pre-tax basis. Bentley also instructed Provident regarding the eligibility of employees for coverage. Further, Bentley is the policyholder. Lastly, Bentley notified eligible employees of the "Bentley Pontiac Group Insurance" through a brochure which stated "How would you pay your bills if you suddenly became unable to work due to a disabling accident or an extended illness? Bentley Pontiac is pleased to offer you a solution."[14] It is obvious that Bentley endorsed the group policy in order to secure long term disability benefits for its employees. Bentley even endorsed the policy by implying that it was the preferred method of obtaining disability insurance through its advertising brochures. To be sure, none of the actions taken by Bentley alone would amount to the endorsement of an employee welfare benefit plan under ERISA; even so, the acts in combination are sufficient to infer that Bentley did endorse the disability insurance plan. *See Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982) ("[N]o single act in itself necessarily constitutes the establishment of the plan, fund, or program.").

### III. CONCLUSION

Because Bentley endorsed the disability insurance plan, it does not fall within the "safe harbor" provision; thus, any issue of state law presented in this case is preempted by ERISA. The action accordingly was properly removed from the Circuit Court of Madison County, and plaintiff's motion to remand is due to be denied. A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

---

[14] Notice of Removal (doc. no. 1), exhibits A-1 - A-3.

DONE this __10th__ day of July, 2002.

_____
United States District Judge